# United States Court of Appeals for the Federal Circuit

_____

**OAKVILLE HILLS CELLAR, INC.,
dba DALLA VALLE VINEYARDS,**
*Appellant*

**v.**

**GEORGALLIS HOLDINGS, LLC,**
*Appellee*

_____

2016-1103

_____

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in No. 91211612.

_____

Decided: June 24, 2016

_____

JAMES SCOTT GERIEN, Dickenson Peatman & Fogarty, Napa, CA, for appellant.

WARREN L. DRANIT, Spaulding McCullough & Tansil LLP, Santa Rosa, CA, for appellee.

_____

Before LOURIE, MOORE, and CHEN, *Circuit Judges.*

LOURIE, *Circuit Judge.*

Oakville Hills Cellar, Inc. ("Oakville"), doing business as Dalla Valle Vineyards, appeals from the decision of the United States Patent and Trademark Office ("PTO") Trademark Trial and Appeal Board ("the Board") dismissing its opposition to an application filed by Georgallis Holdings, LLC ("Georgallis") to register a MAYARI mark for use on wine. *See Oakville Hills Cellar, Inc. v. Georgallis Holdings, LLC*, No. 91211612, 2015 WL 4573202 (T.T.A.B. July 16, 2015) ("*Opinion*"). Because substantial evidence supports the Board's finding that Oakville's registered mark MAYA and Georgallis's applied-for mark MAYARI are sufficiently dissimilar, we *affirm*.

BACKGROUND

Georgallis filed an application at the PTO, seeking to register the mark MAYARI in standard characters for use on wine in International Class 33. Oakville opposed the registration, alleging that Georgallis's mark would likely cause confusion with Oakville's previously registered and used mark MAYA in typed form, which is equivalent to standard characters, also for use on wine in International Class 33. *Opinion* at *1 & n.2.

The parties argued, and the Board evaluated, the following *DuPont* factors: (1) the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation, and commercial impression ("the first *DuPont* factor"); (2) the similarity or dissimilarity of the goods as described in an application or registration or in connection with which a prior mark is in use ("the second *DuPont* factor"); (3) the similarity or dissimilarity of trade channels ("the third *DuPont* factor"); (4) the conditions under which and buyers to whom sales are made ("the fourth *DuPont* factor"); (5) the fame of the prior mark; (6) similar marks in use on similar goods ("the sixth *DuPont* factor"); (7) the absence of actual confusion; (8) the right to exclude others from use; (9) the extent of potential confusion; and (10) other probative facts, here,

federal labelling requirements applicable to wine. *Id.* at *2–8; *see also In re E.I. DuPont de Nemours & Co.*, 476 F.2d 1357, 1361 (CCPA 1973) (listing factors relevant to the likelihood of confusion determination).

The Board found that the second, third, and fourth *DuPont* factors favored a finding of likelihood of confusion, *Opinion* at *2–3, but that the first *DuPont* factor favored a finding of *no* likelihood of confusion, *id.* at *3–6. The Board also found the remaining *DuPont* factors that it analyzed to be neutral. *Id.* at *6–8.

Specifically, for the second *DuPont* factor, the Board found the goods at issue to be "identical," despite "a substantial difference in price" and other "differences in the specific nature of the wines" sold by Oakville and Georgallis.* *Id.* at *2. The Board reasoned that "[i]n the context of an opposition proceeding, the question of registrability of an applicant's marks must be decided on the basis of the identifications of goods set forth in the application and registration at issue." *Id.* Because Georgallis "has requested a registration applicable to all kinds of wine in all price ranges," and because Oakville's registration "covers use of its mark on all kinds of wine," the Board found the second *DuPont* factor to weigh in favor of a finding of likelihood of confusion. *Id.* Likewise, the Board found the third and fourth *DuPont* factors, namely, the similarity of trade channels and the sophistication of buyers, to weigh in favor of a finding of likelihood of confusion. *Id.* at *3.

Turning to the first *DuPont* factor, the similarity or dissimilarity of the marks in appearance, sound, connotation, and commercial impression, the Board found that

---

\* The evidence shows that Oakville's wines cost between $175 and $365 per bottle, whereas Georgallis's wines have been offered at $25 per bottle. *Opinion* at *3.

the marks at issue, MAYA and MAYARI, "are visually similar only in part." *Id.* at *6. The Board noted that MAYA and MAYARI share the initial four letters. *Id.* at *4. But the Board found "no reason to perceive any separation, visual or otherwise, between the MAYA- and -RI portions" of MAYARI because "[t]he letters RI, alone, have no relevant meaning, providing no reason for a customer to view the mark logically as MAYA *plus* RI, rather than as a single unitary expression." *Id.* The Board also rejected Oakville's argument that "the bottle label [bearing the mark MAYARI] will inevitably appear to read 'MAYA' at certain orientation relative to an observer," reasoning that "the *likelihood* of such a mistake remains a matter of speculation, absent evidence regarding the occurrence or regularity of mistakes of this sort." *Id.*

As to sound, the Board found "nothing in the record to indicate how MAYARI would be pronounced." *Id.* While acknowledging that MAYA could be pronounced the same in those marks, the Board "consider[ed] the possibility that MAYARI might be pronounced with the emphasis on its second or third syllables, and that the -YAR- syllable might be salient." *Id.* The Board thus found that "no evidence show[ed] that [the marks] would be pronounced alike, and they may well be pronounced quite differently." *Id.* at *6.

Regarding meaning, Oakville argued that both marks are female given names and the names of goddesses. *Id.* at *5. In particular, Oakville contended that Maya is a female name of Latin origin and the name of a Hindu goddess, whereas Mayari is a female name of Filipino origin and the name of a Filipino goddess. *Id.* Oakville also presented evidence to show that Mayari appears on an Internet list of Filipino names under the rubric of "Gods, Goddesses and Deities of the Philippines" and on certain websites that discuss Tagalog myths. *Id.*

But the Board was not persuaded that "customers would be aware of the more esoteric meanings of the marks." *Id.* at *6. Rather, the Board agreed with Georgallis and found that "most customers would likely perceive MAYA as a female personal name or the name of the pre-Columbian civilization" and "perceive MAYARI as a coinage without meaning." *Id.* The Board reasoned that "customers would likely find the term MAYA to be somewhat familiar, while finding MAYARI unfamiliar." *Id.* Overall, the Board found that "the marks create significantly different commercial impressions." *Id.* The Board therefore found the first *DuPont* factor to weigh against a finding of likelihood of confusion. *Id.*

For the sixth *DuPont* factor, similar marks in use on similar goods, Georgallis submitted third-party registrations and applications for the registration of MAYA-formative marks for beverages, mostly beverages other than wine. *Id.* at *7. But the Board gave "little weight" to that evidence, reasoning that third-party registrations "are not evidence that the marks are in use." *Id.* The Board thus found this factor to be neutral. *Id.*

Balancing the relevant *DuPont* factors, the Board noted that the parties' goods are identical and would travel through the same trade channels to the same classes of customers, some of whom would exercise no more than an ordinary degree of care in selecting the goods; but that the marks are visually similar only in part, are only possibly similar in their pronunciation, and would likely be perceived to have different meanings and overall commercial impressions. *Id.* at *8. The Board therefore concluded that "the marks are sufficiently different that . . . confusion is not likely." *Id.* Accordingly, the Board dismissed Oakville's opposition.

Oakville timely appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(4)(B).

DISCUSSION

We review the Board's legal conclusions without deference and its factual findings for substantial evidence. *In re Pacer Tech.*, 338 F.3d 1348, 1349 (Fed. Cir. 2003). "Substantial evidence is 'more than a mere scintilla' and 'such relevant evidence as a reasonable mind would accept as adequate' to support a conclusion." *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

Likelihood of confusion is a question of law based on underlying findings of fact. *In re Chatam Int'l Inc.*, 380 F.3d 1340, 1342 (Fed. Cir. 2004). We assess a likelihood of confusion based on the factors set forth in *DuPont*. 476 F.2d at 1361. "The likelihood of confusion analysis considers all *DuPont* factors for which there is record evidence but 'may focus . . . on dispositive factors, such as similarity of the marks and relatedness of the goods.'" *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1164–65 (Fed. Cir. 2002) (quoting *Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 1336 (Fed. Cir. 2001)).

Oakville argues that the Board's finding of insufficient similarity between MAYA and MAYARI is unsupported by substantial evidence. According to Oakville, the Board overlooked record evidence of the marks' similarities in appearance, pronunciation, meaning, and overall commercial impression. Specifically, Oakville argues that MAYA dominates both marks, and that the suffix -RI in MAYARI is of minor import as a distinguishing element, particularly with the registered mark MAYA entirely subsumed within the leading portion of MAYARI, which could cause confusion between Oakville's MAYA wine and Georgallis's MAYARI wine. Oakville contends that the visual similarity between the marks is exacerbated by the applied-for mark being in standard character form, not limited to any particular style. Oakville also argues that the Board engaged in unsupported speculation regarding

potential pronunciations of the marks, while acknowledging the lack of record evidence on pronunciation.

Moreover, Oakville emphasizes on appeal that both marks are derived from the female name Maya: MAYARI is a portmanteau of the names of Georgallis's owner's daughters, Maya and Arianna, whereas MAYA is the name of Oakville's owner's daughter. Oakville notes that the marks are also the names of goddesses. Oakville thus argues that the Board erred in finding that MAYARI has no meaning and that a consumer would not view MAYARI as MAYA plus RI. Furthermore, Oakville argues that both marks are arbitrary in relation to wine and thus that any difference in meaning would be lost on consumers given the similarity in appearance and sound.

Additionally, Oakville argues that the conditions for purchase are ripe for confusion, given that the parties are selling identical goods via the same channels of trade, including in bars under noisy and chaotic conditions. Finally, Oakville argues that, as the prior user, any doubt should be resolved in its favor, and that the Board's decision undermines the value and protection of federally registered marks.

Georgallis responds that the Board correctly declined to dissect MAYARI into MAYA and RI, an element with no meaning, and instead found that consumers would perceive MAYARI as a unitary whole and a coined term. According to Georgallis, the Board properly considered the marks in their entireties and found that MAYA is familiar to U.S. consumers as a reference to the Mayan culture and as a popular female given name, whereas MAYARI is unfamiliar to U.S. consumers, not having appeared in the top 1000 baby names for the past century based on searches of the "Popular Baby Names" website of the Social Security Administration. Georgallis contends that the Board correctly found that the unfamiliar MAYARI is readily distinguishable from the familiar

MAYA, and based on that, correctly concluded that MAYARI is not confusingly similar to MAYA even when both marks are used on wine.

Georgallis further argues that, if we were to vacate or reverse the Board's finding on the first *DuPont* factor, we should also vacate its finding on the sixth *DuPont* factor, similar marks in use. Appellee's Br. 21–22. According to Georgallis, the Board erred in deciding to give little weight to the evidence of third-party registrations. Rather than finding the sixth *DuPont* factor to be neutral, Georgallis contends, the Board should have found the sixth *DuPont* factor to favor a finding of no likelihood of confusion. Additionally, Georgallis argues that Oakville is estopped from asserting that MAYARI is confusingly similar to MAYA in light of prosecution statements made in a related application, where Oakville argued that MAYA was distinct from MAYAN.

We conclude that substantial evidence supports the Board's finding that the marks at issue are sufficiently dissimilar as to appearance, sound, meaning, and commercial impression. In determining similarity or dissimilarity, the marks must be compared in their entireties. While there is no dispute that MAYA is understood by consumers as a word with established meanings, that simple fact alone does not create a basis for dissecting MAYARI into MAYA- and -RI. Here, the Board properly found that there is insufficient evidence that consumers would perceive MAYARI as MAYA- and -RI. As the Board noted, "[t]he letters RI, alone, have no relevant meaning, providing no reason for a customer to view the mark logically as MAYA plus RI, rather than as a single unitary expression." *Opinion* at *4 (emphasis omitted). Moreover, just like "Maya," "may" and "ma" are also familiar words in the English language. Even assuming that consumers were to dissect MAYARI into separate components, Oakville failed to demonstrate to the Board why

the dissection would be "MAYA-RI," not "MAY-ARI" or "MA-YARI."

We also agree with Georgallis that the Board did not err in finding that "no evidence show[ed] that [the marks] would be pronounced alike, and they may well be pronounced quite differently." *Id.* at *6. The parties do not dispute that there is no record evidence on how MAYARI might be pronounced. Oakville's interpretation of how MAYARI might be pronounced is based solely on its dissection of the mark into MAYA- and -RI. On appeal, Oakville relies heavily on Georgallis's admission that it coined the term MAYARI to honor the daughters of its owner, Maya and Arianna. But the record shows that this information is only available to the public through Georgallis's website, and there is no evidence that consumers would be generally aware of the origin of the MAYARI mark. Consequently, this fact could not have affected how consumers pronounce MAYARI. Even assuming that consumers were aware of the mark's origin, there is no evidence that they would emphasize "Maya" in pronouncing MAYARI. As the Board noted, it is possible that "MAYARI might be pronounced with the emphasis on its second or third syllables, and that the -YAR- syllable might be salient." *Id.* at *4. The Board thus did not err in finding that the marks "are only possibly similar, in part, in their pronunciation." *Id.* at *8.

Moreover, substantial evidence supports the Board's finding that MAYA is a familiar word, whereas MAYARI has no recognized meaning to U.S. consumers. In particular, Georgallis submitted evidence that Maya is a recognized female name and has several salient meanings as shown by dictionary definitions. Georgallis also submitted evidence that Mayari has not appeared among the top 1000 baby names for the past century based on its searches of the Social Security Administration website. In contrast, Oakville submitted evidence that Mayari is a baby name, but that evidence consisted of an Internet list

of Filipino names; Oakville did not submit any evidence that U.S. consumers would generally understand Mayari to be a common female name. Oakville also submitted evidence from the Internet to show that Mayari is the name of a goddess in Tagalog mythology. But, again, there is no evidence that this information is generally known to U.S. consumers. The Board thus did not err in rejecting "the more esoteric meanings" proffered by Oakville, *id.* at \*6, and in finding that "most customers would likely perceive MAYA as a female personal name or the name of the pre-Columbian civilization" and "perceive MAYARI as a coinage without meaning," *id.*

Accordingly, the Board correctly found that the unfamiliar MAYARI is distinguishable from the familiar MAYA, and that the marks, considered in their entireties, are dissimilar as to appearance, sound, meaning, and overall commercial impression. We also conclude, on this record, that the Board did not err in balancing all relevant *DuPont* factors and in determining that the dissimilarity of the marks was sufficient to preclude a likelihood of confusion. As we have held, "a single *DuPont* factor may be dispositive in a likelihood of confusion analysis, especially when that single factor is the dissimilarity of the marks." *Odom's Tenn. Pride Sausage, Inc. v. FF Acquisition, L.L.C.*, 600 F.3d 1343, 1346–47 (Fed. Cir. 2010) (citation and internal quotation marks omitted); *see also Kellogg Co. v. Pack'em Enters., Inc.*, 951 F.2d 330, 333 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single *DuPont* factor may not be dispositive.").

We are also unpersuaded by Oakville's argument that the Board's decision undermines the value and protection of federally registered marks. As indicated, Oakville has failed to demonstrate any reversible error in the Board's factual findings regarding the first *DuPont* factor and in determining that Georgallis's applied-for mark was *not* confusingly similar to Oakville's registered mark. And it

is not a violation of any policy of protecting trademarks to dismiss an opposition to the registration of marks that are not confusingly similar.

We have considered the remaining arguments, but find them unpersuasive. We therefore conclude that substantial evidence supports the Board's factual findings underlying the first *DuPont* factor, and that the Board did not err in determining, based on the record evidence, that there was no likelihood of confusion. Because we affirm the Board's finding as to the first *DuPont* factor in favor of Georgallis, which resolves the present appeal, we need not address Georgallis's arguments regarding the sixth *DuPont* factor and prosecution estoppel.

CONCLUSION

For the foregoing reasons, we affirm the decision of the Board dismissing Oakville's opposition.

**AFFIRMED**